**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CHARLES COLEMAN, JR., | |
| Plaintiff, | No.  3:26-CV-770 |
| -against- | COMPLAINT AND JURY DEMAND |
| CITY OF NEW HAVEN; JAMES STEPHENSON, in his individual capacity; and CHRISTOPHER GRICE, in his individual capacity, | May 19, 2026 |
| Defendants. | |

**INTRODUCTION**

1.      Plaintiff Charles Coleman, Jr., spent decades in prison after being convicted of two 1986 sexual assaults that he did not commit until DNA testing exonerated him in 2024.

2.      Mr. Coleman had been seeking DNA testing of the sexual assault kit taken from one of the victims since at least 1993.

3.      His requests were thwarted, however, by the repeated false representations of the New Haven Police Department (NHPD) that the sexual assault kit had been destroyed.

4.      It had not been destroyed. The NHPD had it the whole time.

5.      Once the sexual assault kit was finally found on May 20, 2024, it was promptly tested, and Mr. Coleman was excluded as the source of the male DNA.

6.      His conviction was swiftly vacated, and the charges against him were dismissed.

7.    Within less than two months of the discovery of the evidence that the NHPD had falsely claimed did not exist for 31 years, Mr. Coleman returned home to New Haven as a free man.

8.    He did so after nearly 38 years of incarceration, including more than 14 years in solitary confinement.

9.    This suit seeks redress for the NHPD's wrongful course of conduct that deprived Mr. Coleman of access to exonerating DNA evidence for more than three decades, as well as other violations of his civil rights.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

10.    The Court has subject matter jurisdiction over Plaintiff's federal-law claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because the claims arise under the laws of the United States and allege the deprivation of constitutional rights.

11.    The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

12.    Venue lies in this Court under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

13.    Plaintiff filed a notice of his intention to commence this action pursuant to C.G.S. § 7-465(a) with the Clerk of the City of New Haven on or about January 15, 2025.

## JURY DEMAND

14.    Plaintiff demands trial by jury.

## PARTIES

15.    Plaintiff Charles Coleman, Jr., is 67 years old. He is a citizen of the United States and resides in Connecticut.

16.    Defendant City of New Haven is a municipal corporation organized under the laws of the State of Connecticut. At the relevant times, the NHPD was responsible for investigating criminal offenses that occurred within the city.

17.    Defendant James Stephenson was, at the relevant times, a detective in the NHPD who performed the duties of a fingerprint examiner (among other things), acting under color of state law.

18.    Defendant Christopher Grice was, at the relevant times, a detective in the NHPD who performed the duties of a fingerprint examiner (among other things), acting under color of state law.

## FACTS

### *The "East Rock Rapist" Prompts Widespread Fear in New Haven*

19.    Between 1980 and the summer of 1986, one or more unknown intruders committed a series of sexual assaults, home invasions, and burglaries in New Haven's East Rock neighborhood.

20.    The crimes seemed to follow a pattern: someone broke into a first-floor apartment in the pre-dawn hours, often by cutting through a window screen, and attacked a woman sleeping alone.

21.    Similar attacks also occurred in the adjacent neighborhood of Fair Haven.

22.    The NHPD believed a single man—the "East Rock rapist"—was responsible.

23.    By the spring of 1986, the NHPD had assembled a task force of at least four detectives and twelve patrol officers to investigate the pattern of East Rock burglaries and sexual assaults.

3

24. On information and belief, NHPD Detective Anthony DiLullo—who was regarded within the department as a skilled investigator and was regularly assigned to high-profile cases—was a key member of the task force.

### The Sexual Assault of R.N. at 625 Orange Street on March 4, 1986

25. In the early morning hours of March 4, 1986, a man broke into the apartment of R.N. at 625 Orange Street in East Rock.

26. The intruder accessed the apartment by removing a pane of glass from a window accessed from a fire escape.

27. The intruder vaginally and anally assaulted R.N. and forced her to perform oral sex.

28. R.N. said she "believed" the intruder was black and described him as "about 5'11," "medium frame and weight," age "30 to 40," without facial hair.

29. Because the entire assault occurred in darkness, R.N. said she would be unable to identify the intruder.

30. According to R.N., the intruder asked for money after the assault.

31. According to R.N., she retrieved her pocketbook and took out a number of envelopes containing cash, which the intruder rifled through.

32. According to R.N., the intruder asked her if she had a car.

33. According to R.N., the intruder tied her up and said he was doing so to give himself enough time to get back to the train station to return to Bridgeport.

34. A sexual assault kit was taken from R.N. at Yale-New Haven Hospital on March 4, 1986 (the "R.N. Sexual Assault Kit").

35. The NHPD delivered the R.N. Sexual Assault Kit to the State Laboratory by the NHPD on March 6, 1986.

4

36.     The State Laboratory found that spermatozoa were present in the anal smear and seminal acid phosphatase was present in the anal swab from the R.N. Sexual Assault Kit.

37.     According to an April 25, 1986, police report, NHPD Officer John Pleckaitis processed the scene at 625 Orange Street for fingerprints on March 4.

38.     Officer Pleckaitis claimed that he found no latent prints on the pane of glass removed from R.N.'s window, but that he lifted latent prints from the inner and outer trim of the window, the top of the window frame, and a book found on R.N.'s bed.

39.     Officer Pleckaitis further claimed that envelopes and papers found on R.N.'s bed were processed at the NHPD's Identification Unit and that partial latent prints of value were developed on the envelopes.

### The Assault of D.A.L. at 132 Foster Street on June 23, 1986

40.     In the early morning hours of June 23, 1986, a man broke into the apartment of D.A.L. at 132 Foster Street in East Rock.

41.     According to D.A.L., she was asleep in bed and woke up to find a man on top of her with a knife to her neck and his hand over her mouth.

42.     D.A.L. struggled with the intruder and sought to escape, and in doing so sustained a gash on her hand from the knife.

43.     D.A.L. feigned an asthma attack and convinced the intruder she needed to take medicine that was in her bathroom.

44.     After being left alone in the bathroom, D.A.L. fled the apartment and hid under a parked car until she stopped a passing truck for assistance.

45.     D.A.L. described the intruder as a 5'10" black man, with a muscular build and dark complexion, wearing dark clothing.

46.    D.A.L. said she would be unable to identify the intruder because he was wearing a ski mask over his face.

47.    D.A.L. said she partially removed the intruder's ski mask during the struggle but did not say she observed any facial hair.

48.    According to a report dated June 27, 1986, NHPD Detective Marc Caporale processed the scene for fingerprints on June 23.

49.    Detective Caporale's report states: "The intrud[e]r entered through the north side bathroom window."

50.    Detective Caporale later testified, however, that he had simply been told by fellow officers that the window was the point of entry and had processed it as directed by other responding officers.

51.    According to D.A.L., a detective told her that the intruder probably entered the apartment through the bathroom window.

52.    Detective Caporale claimed to have processed the inside of the bathroom window and the surrounding area for fingerprints and to have lifted latent palm prints from the inner part of the bathtub.

53.    Detective Caporale did not process the exterior of the bathroom window for latent prints.

54.    D.A.L.'s description of the intruder was broadcast over the police radio during the early morning hours of June 23.

55.    While canvassing for a suspect, NHPD Officer Brian Donnelly encountered a man on a bicycle named Allen Hudson, who matched the description.

56.    Hudson gave a false name, was "very evasive" in response to questions about his whereabouts, and "soon became very excited and belligerent."

57. Hudson was in possession of a television antenna box, a bracelet and a gold ring, and headphones marked "Yale Language Lab."

58. Hudson refused to explain how he had obtained these items.

59. Hudson was arrested on active warrants.

60. Officer Donnelly seized the items in Hudson's possession as potential evidence in connection with the burglary and assault of D.A.L. at 132 Foster Street.

61. Hudson had at least 30 prior arrests and prior convictions for burglary, assault, and robbery.

62. Hudson was wanted for escape from custody from the Whiting Forensic Division of the Connecticut Valley Hospital, which treats mentally ill prisoners and conducts competency evaluations of criminal defendants awaiting trial.

### The Sexual Assault of D.L. at 280 Peck Street on July 7, 1986

63. In the early morning hours of July 7, 1986, a man broke into the apartment of D.L. at 280 Peck Street in Fair Haven.

64. The intruder gained entry to the apartment by cutting the screen of an open living room window in the front of the house facing Peck Street.

65. According to D.L., she awoke in bed to find the intruder with his hand over her mouth.

66. The intruder told her that if she cooperated, her mother, who was asleep in another room, would be unharmed.

67. The intruder vaginally assaulted D.L.

68. According to D.L., after the assault, the intruder covered her with a sheet and then asked her for money.

7

69.     When she indicated where she kept her money, the intruder opened her jewelry box and removed money from an envelope kept inside.

70.     D.L. described the intruder as approximately 5'9" tall with a medium build, with a mask covering his face.

71.     D.L. estimated that the intruder was in his early to mid-20s.

72.     D.L. said she believed the intruder was black because he "smelled black."

73.     According to D.L., the intruder partially lifted his mask to kiss her at one point.

74.     According to D.L., the intruder did not have facial hair.

75.     Because the entire assault occurred in darkness and the intruder was masked, D.L. said she would be unable to identify the intruder.

76.     D.L.'s bedroom window—which was also open, but with the screen intact—also faced the front of the house on Peck Street.

77.     A sexual assault kit was taken from D.L. at Yale-New Haven Hospital on July 7, 1986 (the "D.L. Sexual Assault Kit").

78.     The D.L. Sexual Assault Kit was delivered to the State Laboratory by the NHPD on July 10, 1986.

79.     On November 5, 1986, the State Laboratory reported its finding that spermatozoa were present in the vaginal smear and seminal acid phosphatase was present in the vaginal swab from the D.L. Sexual Assault Kit.

80.     According to a July 9 report, Detective Caporale processed the 280 Peck Street scene for fingerprints on July 7.

81.     Detective Caporale claimed to have processed the interior and exterior windowsill of the window through which the intruder entered, as well as the screen.

82.    According to Detective Caporale, latent prints were lifted from the exterior windowsill of the entry window.

83.    Detective Caporale claimed to have processed the items on top of the dresser, including the jewelry box, but not to have found any latent prints.

84.    Detective Caporale also claimed to have processed D.L.'s bedroom window, which faced the front of the house but was not the point of entry, and to have lifted latent fingerprints from the exterior sill of that window.

### *The NHPD Turns Its Attention to Mr. Coleman*

85.    The investigation, arrest, and prosecution of Mr. Coleman rested almost entirely on purported identifications of latent fingerprints and palm prints.

86.    These purported identifications were at minimum erroneous, if not fabricated.

87.    The NHPD's latent print examiners, including Detectives Stephenson and Grice, purported to identify Mr. Coleman as the source of latent finger and palm prints with 100% certainty, to the exclusion of all other living individuals.

88.    Today, however, the scientific community—including latent print experts themselves—rejects the notion that a fingerprint can be definitively attributed to a single source to the exclusion of all others.

89.    To take one example, the State Laboratory now defines a fingerprint "identification" to mean only that "contact may have been made at some point in time" between the source and the surface.

90.    This definition is consistent with guidance issued to latent print examiners by the United States Department of Justice in 2020.

91.    Latent print evidence can also be fabricated.

92. For example, a special prosecutor found that, from 1984 to 1992, members of the New York State Police Troop C Identification Unit systematically fabricated fingerprint evidence against suspects by, among other things, lifting impressions from their inked fingerprint cards or from items they had touched and falsely attributing them to crime scenes or swapping them with real latent lifts from crime scenes.

93. Here, the NHPD's use of latent prints to falsely link Mr. Coleman to these crimes he did not commit began on July 7, 1986.

94. On that date, according to his report, Detective Stephenson purportedly examined the latent lifts purportedly taken from the exterior sill of the bedroom window at 280 Peck Street—which was not the window through which the intruder entered.

95. Stephenson's report states: "While comparing possible suspects a fingerprint card belonging to a Charles Coleman was compared to the latent impressions taken from [the] front bedroom window of 280 Peck St., and a positive identification was made. The right middle and ring fingers in the second joint area of Mr. Coleman were positively identified as being the same impressions found on the right side of the exterior bedroom window on the still."

96. The report continues: "The basis for the positive identification is the comparison of the characteristic ridge detailing in both the inked impressions and the latent impressions. The positive identification was verified by Officer Pleckaitis of the Identification Unit on this same date."

97. It is unclear—and no NHPD report reflects—how Mr. Coleman became a "possible suspect" whose fingerprints were subject to comparison in the first place.

98. At the time, Mr. Coleman was a 27-year-old New Haven resident who had never served a day in prison.

99. On July 7, 1986, Detective Mel Cartoceti sought a warrant for Mr. Coleman's arrest for the sexual assault and burglary of D.L. at 280 Peck Street.

100. The warrant for Mr. Coleman's arrest was issued in the early morning hours of July 8, 1986.

### As Police Move to Arrest Mr. Coleman, Allen Hudson Commits an Apparently Related Crime at 395 Orange Street

101. In the early morning hours of July 8, 1986, a man broke into the apartment of K.K. at 395 Orange Street in East Rock.

102. K.K., who was a light sleeper, awoke in darkness to find a man standing in her bedroom and walking toward her bed.

103. Cash had been stolen from her wallet in her backpack.

104. The intruder had entered K.K.'s apartment by cutting open the screen of an open living room window facing the front of the building.

105. When K.K. woke up, the intruder fled.

106. Because the front door remained locked, police theorized that the intruder fled through the same window through which he had entered.

107. According to a later report, Detective Pleckaitis processed the scene for latent fingerprints.

108. During those same early morning hours of July 8, two NHPD detectives were working an overtime assignment in the Orange Street area related to the "East Rock rapist" series of crimes.

109. The two detectives were advised that Mr. Coleman had been identified as a suspect by a purported fingerprint identification and were directed to look out for Mr. Coleman and his vehicle, a 1968 Chevy Camaro.

11

110.    The two detectives were conducting surveillance outside Mr. Coleman's apartment.

111.    After hearing the radio report of the incident involving K.K. at 395 Orange Street at approximately 1:38 am, the two detectives responded to that location to look for suspects.

112.    Finding none, the two detectives returned to Mr. Coleman's apartment, where they discovered that Mr. Coleman had returned home in his vehicle just after 2:00 am.

113.    On information and belief, the two detectives believed they were catching Mr. Coleman returning from the scene of the 395 Orange Street burglary.

114.    The two detectives were advised by a supervisor that the arrest warrant had been issued and arrested Mr. Coleman sitting in his vehicle outside his apartment.

115.    On July 23, 1986, Defendant Christopher Grice identified a latent print on the interior sill of the window through which the intruder entered K.K.'s apartment at 395 Orange Street as having been left by the left index finger of Allen Hudson.[1]

116.    Defendant Grice also identified a latent print from the doorknob of the victim's bedroom as having been left by the right palm of Allen Hudson.

117.    Defendant Stephenson verified these identifications.

118.    As a key member of the "East Rock rapist" task force, Detective DiLullo was, on information and belief, aware of the June 23 stop and arrest of Hudson pursuant to D.A.L.'s suspect description and the seizure of items from Hudson in connection with the 132 Foster Street incident.

---

[1]    Hudson's first name is also spelled "Alan" or "Alen" in some records. On information and belief, the correct spelling is "Allen."

119.    DiLullo responded to the scene of the 395 Orange Street burglary and was aware of its similarity to other offenses that the NHPD believed to be part of the pattern.

120.    According to a later report he authored, Detective DiLullo was also aware of the identification of Hudson as the perpetrator of the 395 Orange Street burglary that occurred just before Mr. Coleman's arrest.

### Detective Stephenson Participates in a Search of Mr. Coleman's Vehicle, Yielding Three Lawful Knives

121.    Defendant James Stephenson personally participated in a search of Mr. Coleman's vehicle on July 8.

122.    The search of Mr. Coleman's vehicle yielded three knives.

123.    All the knives were lawful for Mr. Coleman to possess.

124.    None of the knives was ever found to have blood or human tissue on it, or was ever linked in any way to any of the crimes or crime scenes.

125.    Because he personally participated in the search of Mr. Coleman's vehicle, Defendant Stephenson had access to items that Mr. Coleman was known to have touched.

### Detective Stephenson Makes Additional Fingerprint Identifications Under Unusual Circumstances

126.    Upon Mr. Coleman's arrest on July 8 for the sexual assault of D.L. at 280 Peck Street, his fingerprints and palm prints were taken by the NHPD.

127.    A second booking officer also took impressions of Mr. Coleman's palms on July 8.

128.    For unknown reasons, Defendant Stephenson also personally took his own set of Mr. Coleman's inked fingerprints and palm prints on July 8.

13

129.    On July 11, again for unknown reasons, Defendant Stephenson personally took Mr. Coleman's inked fingerprints and palm prints.

130.    This was the second time Stephenson had taken Mr. Coleman's prints, and the fourth time the NHPD had taken them, in a span of four days.

131.    No police report or other police record reflects any justification for Defendant Stephenson to have taken these prints on July 8 or July 11.

132.    Defendant Stephenson later gave materially inconsistent accounts of the purpose of the July 11 prints in sworn testimony.

133.    On one occasion, he claimed they were purely for courtroom demonstrative charts; on another, he testified that he used them to "effectuate[]" an identification.

134.    On information and belief, as of July 11, 1986, no prosecutor had requested prints for a courtroom demonstration, and Defendant Stephenson had not been subpoenaed to testify.

135.    According to a July 9 report by Defendant Stephenson, he purportedly compared an inked palm impression of Mr. Coleman's left hand to a latent impression left on the flap of an envelope found on R.N.'s bed at 625 Orange Street.

136.    Defendant Stephenson purportedly identified the latent partial palm print on the envelope as having been left by Mr. Coleman.

137.    Another detective purportedly "verified" this purported identification.

138.    According to a July 10, 1986, arrest warrant application prepared by Detective Cartoceti, Defendant Stephenson purportedly compared the latent palm prints lifted from the bathtub in D.A.L.'s apartment at 132 Foster Street to Mr. Coleman's palm prints.

139. Defendant Stephenson purportedly identified a single partial palm print from D.A.L.'s bathtub to Mr. Coleman's left palm.

140. Defendant Grice purportedly "verified" this purported identification.

141. No elimination prints were taken from D.A.L. or compared to the partial palm print purportedly lifted from the bathtub.

142. On information and belief, the practice of the NHPD Bureau of Identification was only to verify positive identifications of latent prints, not exclusions or inconclusive comparisons.

143. On information and belief, the practice of the NHPD Bureau of Identification was only to report positive identifications of latent prints in police reports or other official records, not to report exclusions or inconclusive comparisons.

144. On information and belief, Mr. Coleman was excluded as a perpetrator of offenses that the NHPD believed to be related and/or committed by the same person, but those exclusions were not documented or transmitted to the State's Attorney's Office in connection with the 625 Orange Street and 280 Peck Street cases.

145. On information and belief, the NHPD had additional alternative suspects in the sexual assaults of R.N. and D.L. whose prints the Bureau of Identification compared to the latent lifts from those crime scenes, but the results of those comparisons were not documented in a police report or otherwise transmitted to the State's Attorney's Office in connection with the 625 Orange Street and 280 Peck Street cases.

### *Mr. Coleman Denies Involvement*

146. Mr. Coleman's July 8 NHPD booking photograph shows him with a goatee, despite R.N. and D.L.'s assertion that the intruder did not have facial hair.

15

147.    Mr. Coleman always had this same facial hair throughout the relevant time period.

148.    Mr. Coleman consistently maintained his innocence.

149.    In multiple police interrogations, he denied involvement in the crimes.

150.    No victim or eyewitness ever identified Mr. Coleman as a participant in any of the burglaries or assaults.

151.    Yet the NHPD—and the State—contended that his fingerprints and palm prints placed him at the scene of these crimes with 100% certainty, to the exclusion of all others.

### The NHPD Maintains that the R.N. Sexual Assault Kit Is Destroyed, and Mr. Coleman Is Wrongfully Convicted

152.    In 1987, Mr. Coleman entered an *Alford* plea to resolve the charges against him for the sexual assault of R.N. at 625 Orchard Street, the assault of D.A.L. at 132 Foster Street, and the sexual assault of D.L. at 280 Peck Street, among other charges.

153.    Mr. Coleman maintained his innocence and said he felt he had no choice but to accept the plea because he was facing an effective life sentence and the State claimed to have his fingerprints at the crime scenes.

154.    He received a total effective sentence of 35 years.

155.    The *Alford* plea was vacated in 1992 on federal habeas review on the basis that it was not knowing and voluntary.

156.    In January 1993, Mr. Coleman was convicted at trial of the burglary, assault, and attempted robbery of D.A.L. at 132 Foster Street.[2]

---

[2]    At present, this conviction is still intact. Mr. Coleman is also innocent of this crime.

157. The only evidence linking Mr. Coleman to the crime or crime scene was the purported identification of his palm print in the bathtub.

158. Mr. Coleman was sentenced to a 20-year term of incarceration for this offense.

159. In June 1993, Mr. Coleman was convicted at trial of the sexual assault, burglary, and robbery of R.N. at 625 Orange Street.

160. Again, the only evidence linking Mr. Coleman to the crime or crime scene was the purported identification of his palm print on the envelope on the victim's bed.

161. For this second conviction, Mr. Coleman received a sentence of 110 years, consecutive to his 20-year sentence for the assault, effectively condemning him to life in prison.

162. In October 1993, Mr. Coleman was convicted at trial of the sexual assault and burglary of D.L. at 280 Peck Street.

163. Again, the principal evidence linking Mr. Coleman to the crime was the purported identification of his fingerprints on the exterior sill of D.L.'s bedroom window, which was not the window through which the intruder entered her apartment.

164. At this trial, the State also presented results from rudimentary DNA testing of the D.L. Sexual Assault Kit that had been performed at the time.

165. A criminalist testified that that Mr. Coleman was "included as a potential donor" to the sample, and that "this particular DNA profile occurred in approximately fifteen percent of the black population."

166. For the third conviction, Mr. Coleman received a sentence of 40 years, consecutive to his prior 20-year and 110-year sentences.

17

167. As of approximately May 6, 1998, factoring in sentencing credits which Mr. Coleman earned and to which he was legally entitled, Mr. Coleman had served his full sentence for the assault of D.A.L. at 132 Foster Street.

168. From May 6, 1998, until his release from custody on July 18, 2024, Mr. Coleman was incarcerated pursuant to the 110-year sentence imposed for the sexual assault of R.N. at 625 Orange Street.

### The NHPD Repeatedly Prevents DNA Testing by Misrepresenting that the R.N. Sexual Assault Kit Has Been Destroyed

169. According to an NHPD inventory form, the R.N. Sexual Assault Kit was returned to the NHPD from the State Laboratory on or about October 1, 1987.

170. An inventory form is an official judicial record, also known as a "JD-CR-18," that is filed with the court to create a public record of physical items obtained in the course of a criminal investigation by police without a warrant.

171. On June 6, 1990, after Mr. Coleman's motion to withdraw his *Alford* plea had been affirmed on direct appeal, the Superior Court entered an oral order authorizing the destruction of certain evidence in the 625 Orange Street case.

172. The R.N. Sexual Assault Kit was not mentioned in the destruction order and was not within the scope of the destruction order.

173. On or about February 19, 1992, an employee of the NHPD inaccurately recorded on the JD-CR-18 that the R.N. Sexual Assault Kit had been destroyed.

174. Once the *Alford* plea was vacated on habeas review in 1992, the case was restored to the Superior Court docket, and Mr. Coleman faced trial for the sexual assault of R.N.

175.    Mr. Coleman, through his counsel, moved to compel DNA testing of the R.N. Sexual Assault Kit on or about June 8, 1993.

176.    On June 11, 1993, the prosecutor at Mr. Coleman's trial for the sexual assault of R.N. represented to the Court on the record, in reliance on information provided to him by the NHPD, that the R.N. Sexual Assault Kit had been destroyed.

177.    In 1995, the Superior Court held a hearing on a motion to dismiss the charges against Mr. Coleman arising from the 625 Orange Street incident on the basis of the R.N. Sexual Assault Kit's destruction.

### Retesting on the D.L. Sexual Assault Kit Exonerates Mr. Coleman of that Sexual Assault

178.    In October 2021, Mr. Coleman requested that the Conviction Integrity Unit (CIU) of the State's Attorney's Office review his convictions.

179.    In August 2023, Mr. Coleman's counsel informed the CIU that the State Laboratory remained in possession of genomic material from the D.L. Sexual Assault Kit that could potentially be re-tested.

180.    In March 2024, an independent forensic reviewer informed the CIU and Mr. Coleman's counsel at the Connecticut Innocence Project that this genomic material was suitable for retesting.

181.    On May 17, 2024, the State Laboratory excluded Mr. Coleman as a contributor to male biological material recovered from the vaginal swabs and smears taken from D.L.

***The R.N. Sexual Assault Kit Is Located, and Testing Swiftly Exonerates Mr. Coleman***

182.    In light of these DNA findings exculpating Mr. Coleman of the sexual assault of D.L.—for which his consecutive sentence had not yet even begun—the CIU made additional efforts to find the purportedly "destroyed" R.N. Sexual Assault Kit.

183.    On May 20, 2024, the NHPD property room informed the State's Attorney's Office Conviction Integrity Unit that it had found the R.N. Sexual Assault Kit.

184.    On information and belief, the R.N. Sexual Assault Kit had been preserved intact in the custody of the NHPD ever since it was returned on or about October 1, 1987.

185.    On May 20, 2024, Mr. Coleman's counsel learned for the first time—after having been misled for more than three decades—that the R.N. Sexual Assault Kit had been preserved.

186.    The R.N. Sexual Assault Kit was immediately transmitted to the State Laboratory for further testing using modern DNA testing methods.

187.    On June 4, 2024, the Connecticut State Forensic Laboratory excluded Mr. Coleman as a contributor to male biological material recovered from the oral and anal smears taken from R.N.

188.    The State's Conviction Integrity Unit concluded that the new DNA evidence was "clearly exculpatory" and would cause "a reasonable person to lose confidence in the integrity" of Mr. Coleman's convictions for both the 625 Orange Street incident (the sexual assault and burglary of R.N.) and the 280 Peck Street incident (the sexual assault and burglary of D.L.).

20

189. On July 15, 2024, the State moved to vacate Mr. Coleman's convictions for those two offenses.

190. On July 18, 2024, the Superior Court granted the State's motions, and Mr. Coleman moved for dismissal of the charges with prejudice in both cases.

191. The State did not object, and both cases were dismissed with prejudice.

192. Mr. Coleman was immediately released from custody on July 18, 2024.

***Mr. Coleman Suffers Immense Injury During His Wrongful Incarceration***

193. Mr. Coleman was continuously incarcerated from July 8, 1986, to July 18, 2024.

194. Falsely branded the "East Rock rapist," he was a target for threats, violence, and social ostracism in prison.

195. In 1996, Mr. Coleman's mother died while he was in prison, and he was denied the ability to attend the funeral.

196. In 1997, Mr. Coleman was pulled from the top bunk in his cell while fast asleep and violently attacked without provocation by his cellmate.

197. He sustained a broken rib, cuts, and bite marks on his arms and shoulders when his cellmate bit him during the assault.

198. After suffering this unprovoked assault while fast asleep, Mr. Coleman became extremely fearful of living with a cellmate.

199. He refused housing assignments with a cellmate, resulting in him being placed in segregation, and then refused to leave segregation out of fear for his own safety.

200. As a result of the ongoing issues relating to his housing, Mr. Coleman spent more than 5,200 days—more than 14 years—in solitary confinement during his incarceration for the 625 Orange Street and 280 Peck Street sexual assaults.

201. In 2001, Mr. Coleman was transferred to the notorious Wallens Ridge State Prison in Virginia for approximately eight months as part of a program to relieve overcrowding in the Connecticut prisons.

202. At Wallens Ridge, Mr. Coleman and other incarcerated people were subject to extreme measures of control, including the frequent use of four- and five-point restraints and the regular use of tasers or stun guns as a means of discipline.

203. From October 18, 2002, to March 14, 2003, and then again from March 14, 2003, to December 20, 2011, Mr. Coleman was incarcerated at Northern Correctional Institution, a "supermax" facility that was closed in 2021 after multiple lawsuits relating to the exceptionally cruel conditions of confinement there.

204. At Northern, incarcerated people were isolated in concrete cells for at least 22 hours a day with only a tiny slit letting in sunlight.

205. Mr. Coleman ate his meals alone in his cell and was not afforded the opportunity for normal social interaction.

206. As early as March 2003, Mr. Coleman's DOC medical records reflect elevated blood pressure readings and treatment for hypertension, which, on information and belief, was related to the stress of his wrongful confinement.

207. In 2008, Mr. Coleman's father died while he was in prison, and he was denied the ability to attend the funeral.

208.    Mr. Coleman's DOC medical records reflect that he was diagnosed with malnutrition from 2020 to 2022, due on information and belief to his lack of access to nutritious food in prison.

209.    Mr. Coleman was also diagnosed with Vitamin D deficiency in 2022, which on information and belief was related to a lack of sunlight and poor nutrition.

210.    In each and every year of his wrongful incarceration for the sexual assaults of R.N. and D.L., Mr. Coleman experienced mental anguish.

211.    Since his release in 2024, Mr. Coleman has lived quietly in New Haven and has worked to rebuild his life and restore his connections with loved ones.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment – Deprivation of Liberty Interest in Access to DNA and Post-Conviction Procedures to Demonstrate Innocence
(Against Defendant City of New Haven)

212.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

213.    Plaintiff had a constitutionally protected liberty interest in access to and testing of exculpatory DNA evidence pursuant to General Statutes §§ 54-102kk and/or 54-102jj.

214.    In addition or in the alternative, Plaintiff had a constitutionally protected liberty interest in accessing post-conviction remedies to demonstrate his innocence through exonerating DNA evidence, including pursuant to General Statute § 52-582.

215.    These constitutionally protected liberty interests create an essential corollary procedural right to a faithful accounting of the evidence in Defendant City's possession.

23

216.     Defendant City recklessly maintained an inadequate evidence management system that resulted in exculpatory evidence being lost, destroyed, or recorded as lost or destroyed when in fact it was not, as supported by the following illustrative examples.

217.     The NHPD destroyed a sexual assault kit taken from the victim of a November 1981 sexual assault of which Steven Correia was convicted.

218.     The NHPD considered taped statements taken from witnesses to be evidence and customarily stored the original audiotapes in the property room.

219.     In the 1980s and early 1990s, the NHPD had a pervasive practice, regularly criticized by the Connecticut appellate courts, of destroying or "losing" such tapes as well as the tapes of emergency calls. *See, e.g.*, *State v. Jones*, 29 Conn. App. 304 (1992); *see also id*. at 325 & n.9 (Norcott, J., dissenting in part and concurring in the judgment) (collecting cases concerning "the seemingly intractable behavior of the New Haven police department with respect to witness[] statements," calling that behavior "deeply disturbing," and criticizing "what is rapidly becoming the bete noire of Connecticut police departments").

220.     In 1999, NHPD detectives seized phone records as evidence in the investigation of the homicide of Caprice Hardy, of which Vernon Horn and Marquis Jackson were later wrongfully convicted.

221.     The records rebutted the police's contention that Horn had made a phone call with a cell phone stolen from the murder scene and strongly suggested that the caller from the stolen phone was associated with a group of Bridgeport drug dealers.

24

222. The NHPD maintained no record of the seized phone records' existence and no copy of the records until they were discovered in the basement of a retired detective's house in approximately 2018.

223. In 2014, the State of Connecticut undertook a statewide audit of untested sexual assault kits (the Sexual Assault Kit Initiative, or "SAKI"), in which municipal police departments reported the untested kits in their custody.

224. The NHPD reported 65 untested kits, the third-highest total in the state.

225. The number of untested kits was not a function of New Haven's size: Bridgeport had only 13, and Hartford and Stamford each had zero.

226. On information and belief, some of the 65 untested kits located in response to the 2014 SAKI audit had been either inaccurately marked destroyed or had otherwise not been properly tracked by the NHPD property room.

227. By recklessly maintaining an inadequate evidence management system, Defendant City deprived Plaintiff of his constitutionally protected liberty interests without due process of law.

228. As a result, Plaintiff suffered the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – *Brady* – Fourteenth Amendment Right to a Fair Trial
(Against Defendants Stephenson and Grice)

229. Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

230. In 1986, 1987, 1988, 1989, 1990, 1991, 1992, and/or 1993, Defendants Stephenson and Grice failed to disclose exculpatory information within their possession and/or knowledge to the prosecutor in time for its effective use at Plaintiff's criminal trials, and/or failed to intervene to prevent fellow officers' failure to do so.

231. The suppressed exculpatory information included, but was not limited to, the identification of the latent prints recovered from 395 Orange Street to Allen Hudson, the non-identification of Mr. Coleman in connection with other crimes of which he was suspected, and comparisons made to other suspects developed by the NHPD.

232. The suppressed information was favorable to Plaintiff's defense and was material to the outcome of Plaintiff's criminal case, in that its disclosure would have led to a reasonable probability of a different outcome.

233. The information was suppressed intentionally, in bad faith, and/or with deliberate indifference to Plaintiff's rights.

234. As a result of this suppression of material exculpatory or impeachment information and/or failure to intervene to prevent the suppression of material exculpatory or impeachment information, Plaintiff was deprived of liberty and suffered the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 –Fourteenth Amendment Right to a Fair Trial – Municipal Liability for *Brady* Violations
(Against Defendant City of New Haven)

235. Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

236. Plaintiff pursues this count based not only on the conduct of the individually named Defendants, but also other nonparty former NHPD officers who suppressed information favorable to Plaintiff and/or participated in evidence fabrication as set forth above, including but not limited to former Detective Anthony DiLullo.

26

237. In support of this count, Plaintiff relies upon and incorporates by reference the evidence found sufficient to support these theories of liability in other New Haven wrongful conviction civil rights lawsuits arising from conduct close in time to Plaintiff's 1993 trials, including *Morant v. City of New Haven*, No. 3:22-CV-630, and *Carmon v. City of New Haven*, No. 3:23-CV-944.

238. The NHPD had a consistent and widespread practice of suppressing information favorable to the accused in serious felony cases, which constituted a municipal custom or usage.

239. The City and its municipal policymakers were deliberately indifferent to NHPD officers' repeated suppression of exculpatory information, demonstrating its acquiescence and tacit authorization of those actions.

240. By failing to adequately investigate, discipline, and supervise officers who were alleged or found to have suppressed information favorable to the accused, the City was deliberately indifferent to the constitutional rights of its citizens, including Plaintiff, who came in contact with its police officers.

241. By failing to adequately discipline and supervise Detective DiLullo, specifically, in light of his history of misconduct, the City was deliberately indifferent to the constitutional rights of its citizens, including Plaintiff, who came into contact with him.

242. By failing to adequately train its police officers to conduct constitutionally appropriate investigations and disclose exculpatory information to prosecutors, the City was deliberately indifferent to the constitutional rights of its citizens, including Plaintiff, who would be investigated by those officers.

243.    By any and/or all of these means, Defendant City of New Haven caused the violations of Plaintiff's Fourteenth Amendment right to a fair trial.

244.    As a result, Plaintiff suffered the damages hereinbefore alleged.

**FOURTH CAUSE OF ACTION**
Direct Action for Statutory Negligence – Conn. Gen. Stat. § 52-557n
(Against Defendant City of New Haven)

245.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

246.    With respect to the information favorable to Mr. Coleman that is the subject of the *Brady* claims in the Second and Third Causes of Action, all NHPD officers to whom that information was known had a mandatory duty to disclose it in writing to the prosecutor pursuant to Connecticut General Statute § 54-86c(c).

247.    In the alternative to any intentional or bad-faith failure to disclose, one or more officers of the NHPD acting in the performance of their duties within the scope of their employment by Defendant City of New Haven and under color of law negligently failed to disclose such information, in violation of their statutory duty of disclosure.

248.    No later than the purported 280 Peck Street fingerprint identification on July 7, 1986, Mr. Coleman was a readily identifiable person likely to suffer imminent harm from a breach of this statutory duty of disclosure.

249.    As a result, Plaintiff suffered the damages hereinbefore alleged.

250.    Defendant City of New Haven is liable for those damages under General Statutes § 52-557n.

**FIFTH CAUSE OF ACTION**
Direct Action for Negligence – Conn. Gen. Stat. § 52-557n
(Against Defendant City of New Haven)

251.   Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

### Negligence in the Investigation of the Sexual Assaults

252.   The NHPD investigators investigating the sexual assaults of R.N. and D.L.—including but not limited to Detectives DiLullo, Caporale, Pleckaitis, Grice, and Stephenson—owed Plaintiff duties in their investigation of a crime in which he was the primary suspect, including but not limited to duties to exercise reasonable care in their investigation; to process the crime scenes in a reasonably competent manner; to reasonably pursue and disclose exculpatory evidence; to refrain from fabricating evidence; to conduct fair and nonsuggestive identification procedures; and/or to intervene to prevent other law enforcement officers from engaging in misconduct.

253.   One or more of these NHPD officers, acting in the performance of their duties within the scope of their employment by Defendant City of New Haven and under color of law, breached these duties through acts or omissions including, but not limited to:

a.   Failing to reasonably investigate alternative suspects;

b.   Failing to competently process the crime scenes and collect physical evidence;

c.   Failing to exercise reasonable care in reaching inaccurate latent print identifications; and/or

d.   Failing to intervene to prevent other officers from fabricating evidence or using fabricated evidence.

29

***Negligence in Failing to Keep Track of the R.N. Sexual Assault Kit Was Destroyed and Falsely Representing that It Was Destroyed***

254.    In addition, employees of the NHPD repeatedly breached their duties by failing to accurately record the preservation of the R.N. Sexual Assault Kit, falsely representing that the R.N. Sexual Assault Kit had been destroyed, and failing to correct those misrepresentations.

The Ministerial Nature of the Duty

255.    The reason courts issue destruction orders is that, absent such an order, municipal law enforcement agencies are generally required to preserve evidence in a criminal case pursuant to General Statute § 54-36a.

256.    Since 2003, municipal law enforcement agencies have also had a specific duty pursuant to General Statute § 54-102jj to preserve biological evidence.

257.    These statutory duties of preservation, as well as the duty to comply with court orders, also necessarily imply a duty to accurately record when evidence, particularly biological evidence, has been preserved or destroyed.

258.    Additionally, on information and belief, formal NHPD policies and/or written NHPD rules mandated that property room personnel maintain accurate records of what property was stored where.

259.    On information and belief, NHPD officers and property room officials lacked the discretion to record that a sexual assault kit had been destroyed when it had not or otherwise to record the existence and location of evidence in an inaccurate manner.

The Continuing Course of Negligent Conduct

260. Starting no later than February 19, 1992, through May 20, 2024, employees of the New Haven Police Department—including armed police officers with the power of arrest and/or clerical or recordkeeping employees of the agency—failed to follow departmentally approved policies or procedures regarding the maintenance, storage, and/or destruction of evidence with respect to the R.N. Sexual Assault Kit.

261. Starting no later than February 19, 1992, through May 20, 2024, employees of the New Haven Police Department—including armed police officers with the power of arrest and/or clerical or recordkeeping employees of the police agency— made negligent errors and/or omissions in failing to accurately record the preservation of the R.N. Sexual Assault Kit.

262. The specific occasions on which these breaches occurred included, but were not limited to, the following.

263. In mid-1992, the NHPD adopted what was then a new computerized record-keeping system known as the AS400.

264. On information and belief, the computerization of records would have involved a review of existing inventory and existing records, yet property room personnel failed to notice the R.N. Sexual Assault Kit or correct the inventory form falsely claiming it had been destroyed.

265. In 1993, NHPD property room personnel reviewed inventory forms and retrieved physical evidence from the property room in the 625 Orange Street sexual assault case in connection with Mr. Coleman's trial.

266. Those personnel would, on information and belief, have seen the R.N. Sexual Assault Kit among the physical evidence in the case, yet they failed to notice it and/or to correct the inventory form falsely claiming it had been destroyed.

267. To the contrary, property room personnel made a false affirmative representation to the prosecutor in 1993 that the R.N. Sexual Assault Kit had been destroyed, apparently relying solely on the record without exercising due care to check for the evidence itself.

268. In 1995, a hearing was held before the trial court on remand from Mr. Coleman's direct appeal of his conviction for the sexual assault of R.N., concerning whether the charges should have been dismissed in light of the purported destruction of the R.N. Sexual Assault Kit.

269. On information and belief, the State's Attorney's Office consulted with the NHPD at or around the time of the 1995 hearing, and the NHPD re-confirmed the purported destruction of the R.N. Sexual Assault Kit.

270. On information and belief, as part of the process described above at paragraphs 223-228 of identifying untested sexual assault kits in its custody in approximately 2014 in response to the SAKI, the NHPD would have come across and inventoried the untested R.N. Sexual Assault Kit.

271. Yet the NHPD failed to correct its misrepresentation that the R.N. Sexual Assault Kit had been destroyed at that time.

272. In 2016, the NHPD adopted another new computerized record-keeping system, known as the RMS.

273. At that time, on information and belief, that switchover would have again involved a review of existing inventory and existing records, yet property room

personnel failed to notice the R.N. Sexual Assault Kit or correct existing records falsely claiming it had been destroyed.

274. The NHPD's continuing negligent failure to correct its misrepresentation that the R.N. Sexual Assault Kit had been destroyed continued through May 20, 2024, when it finally provided the accurate information to the CIU.

275. On information and belief, on one or more occasions in 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, and/or 2014, among other years, one or more NHPD employees accessed the physical evidence seized in the 625 Orange Street case and knew or had reason to know that the R.N. Sexual Assault Kit was not destroyed, but negligently failed to correct the inaccurate record of its purported "destruction."

276. On information and belief, the NHPD property room maintained or should have maintained records showing which persons accessed the physical evidence relating to the 625 Orange Street case on which dates.

Injury to Plaintiff

277. No later than the purported 280 Peck Street fingerprint identification on July 7, 1986, Mr. Coleman was a readily identifiable person likely to suffer imminent harm—including each and every day of his incarceration beginning on July 8, 1986, and continuing thereafter—from the foregoing breaches of duty.

278. As a result of the foregoing breaches of duty, Plaintiff suffered the damages hereinbefore alleged.

279. Defendant City of New Haven is liable for those damages under General Statutes § 52-557n.

33

## SIXTH CAUSE OF ACTION
Statutory Negligence
(Against Defendants Stephenson and Grice)

280.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

281.    With respect to the information favorable to Mr. Coleman that is the subject of the *Brady* claims in the Second Cause of Action, Defendants Stephenson and Grice had a mandatory duty to disclose all such information known to them in writing to the prosecutor pursuant to Connecticut General Statute § 54-86c(c).

282.    In the alternative to any intentional or bad-faith failure to disclose, Stephenson and/or Grice, acting in the performance of their duties within the scope of their employment by Defendant City of New Haven and under color of law, negligently failed to disclose such information in violation of their statutory duty of disclosure.

283.    No later than the purported 280 Peck Street fingerprint identification on July 7, 1986, Mr. Coleman was a readily identifiable person likely to suffer imminent harm from a breach of this statutory duty of disclosure.

284.    As a result, Plaintiff suffered the damages hereinbefore alleged.

## SEVENTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 7-465
(Against Defendant City of New Haven)

285.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

286.    Defendants Stephenson and Grice were NHPD officers acting in the performance of their duties within the scope of their employment by Defendant City of New Haven and under color of law.

287. Defendants Stephenson and Grice infringed Plaintiff's civil rights and/or caused physical damages to his person and property while performing their duties and acting within the scope of their employment.

288. As a result, Plaintiff suffered the damages hereinbefore alleged.

289. Pursuant to the Second and Sixth Causes of Action, Defendant City of New Haven is liable for Plaintiff's damages under General Statutes § 7-465 for all conduct not arising from willful or wanton acts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against each and every Defendant:

1. Compensatory damages in an amount to be determined at trial;

2. Punitive damages in an amount to be determined at trial, except as to Defendant City of New Haven;

3. Pre- and post-judgment interest to the fullest extent permitted by law;

4. Reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5. Such other and further relief as the Court may deem just and proper.

Dated:          May 19, 2026

                                        The Plaintiff,
                                        CHARLES COLEMAN, JR.

                                        By His Attorneys:

                                        _____/s/ Douglas E. Lieb_____

                                        KAUFMAN LIEB LEBOWITZ & FRICK LLP

                                        Douglas E. Lieb, ct31164
                                        18 East 48th Street, Suite 802
                                        New York, New York 10017
                                        (212) 660-2332
                                        dlieb@kllflaw.com

                                        LAW OFFICE OF DAVID KEENAN

                                        David S. Keenan, ct29707
                                        152 West 57th Street, 8th Floor
                                        New York, New York 10019
                                        (347) 460-4857
                                        dkeenan@davidkeenanlaw.com